IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARLIE JOY DEAL, | ) | Case No. 1:22-cv-1492 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Carlie Joy Deal, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Deal challenges the Administrative Law Judge's negative findings with respect to her SSI application, arguing that the ALJ erred when he determined her substance use disorder was material to her eligibility for disability benefits.  Because the ALJ failed to apply proper legal standards in articulating the ALJ's reasons for why an absenteeism limitation would not be warranted if Deal abstained from substance use and for discounting the opinion evidence to that effect, the Commissioner's final decision denying Deal's application for SSI must be vacated and Deal's case remanded for further consideration.

I.      **Procedural History**

In October 2014, Deal applied for DIB and SSI.[1]  (Tr. 295, 297).[2]  Deal alleged that she

became disabled on October 14, 2004, due to: (i) post-traumatic stress disorder ("PTSD");

(ii) bipolar disorder; (iii) schizoaffective disorder; (iv) pancreatitis; and (v) "Knee Issues."  (Tr.

295, 297, 387).  The Social Security Administration denied Deal's application initially and upon

reconsideration.  (Tr. 83–124, 127–49).  ALJ Susan G. Giuffre heard Deal's case on March 14,

2017 and denied Deal's applications in a June 16, 2017 decision.  (Tr. 60–80, 158–67).  On

August 30, 2018, the Appeals Council vacated the ALJ's decision and remanded for issuance of

a new decision.  (Tr. 150–53).

On February 6, 2019, ALJ Giuffre head Deal's case on remand and denied Deal's

applications in a March 6, 2019 decision.  (Tr. 15–25, 34–55).  On May 5, 2020, the Appeals

Council declined further review.  (Tr. 1–3).  On June 24, 2020, Deal filed a complaint to obtain

judicial review.  (Tr. 1603–05); *see also* CM/ECF for the N.D. Ohio, Case No. 1:20-cv-01384-

BYP, Doc. 1.  On December 22, 2020, the court remanded Deal's case back to the Commissioner

upon the parties' joint stipulation to remand.  (Tr. 1583).

Meanwhile, Deal reapplied for SSI.  *See* (Tr. 1595).  Deal's renewed application alleged

that she became disabled on December 31, 2019, due to PTSD, anxiety, depression, a stroke,

extremity numbness, and nerve damage.  *Id.*  The Social Security Administration denied the

renewed application initially and made no determination upon reconsideration.  (Tr. 1595–99,

1644–47).

---

[1] Deal disclaims any challenge to the ALJ's denial of her application for DIB.  ECF Doc. 12 at 1–2.
Thus, the period under adjudication at issue is from October 9, 2014 to June 9, 2022.  *Koster v. Comm'r
of Soc. Sec.*, 643 F. App'x 466, 478 (6th Cir. 2016) (citing 20 C.F.R. § 416.335).
[2] The administrative transcript appears in ECF Doc. 8.

On August 4, 2021, the Appeals Council vacated the ALJ's March 2019 decision, issued a remand order, and consolidated Deal's cases.  (Tr. 1589–92).  On April 26, 2022, ALJ Frederick Andreas heard Deal's case on remand and denied Deal's applications in a June 9, 2022 decision.  (Tr. 1506–31, 1542–82).  In so ruling, the ALJ determined that Deal had the residual functional capacity ("RFC") to perform work at any exertional level, except:

> [Deal] can understand and remember simple instructions.  She can use judgment to make simple work-related decisions.  She can occasionally interact with supervisors, coworkers, and the public.  She can carry out simple instructions. She cannot perform work requiring a specific production rate, such as assembly line work.  She can deal with occasional changes in a routine work setting.  She would be absent from work one day a week.

(Tr. 1515).  Although this RFC would be work preclusive, the ALJ conducted a second RFC analysis to determine whether Deal's substance use disorder was a contributing material factor to her disability.  (Tr. 1520, 1522).  The ALJ concluded that the absenteeism limitation would only apply when Deal engaged in substance use, which rendered her ineligible for disability.  (Tr. 1522–30).

Deal did not seek Appeals Council review, rendering the ALJ's decision on remand the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1484(d).  On August 22, 2022, Deal filed a complaint to obtain judicial review.  ECF Doc. 1.  On October 31, 2022, the parties consented to magistrate judge jurisdiction.  ECF Doc. 10.

II.     **Evidence**

A.      **Personal, Educational, and Vocational Evidence**

Deal was born on October 19, 1983; she was 20 years old on the alleged onset date and 38 years old on the date of the ALJ's decision on remand.  (Tr. 297).  Deal had two years of college education and no specialized or vocational training.  (Tr. 388).  Deal had prior experience

as an administrative assistant, cashier, and telemarketer, which the ALJ determined she could not perform.  (Tr. 378, 1519, 1530, 1777).

### B.    Relevant Medical Evidence

Deal focuses her challenge upon the ALJ's consideration of the evidence of her mental health-related impairments; thus, it is unnecessary to summarize the medical and other evidence related to her physical impairments.

On August 13, 2014, Deal visited Kelley Kauffman, CNP, for a psychiatric evaluation. (Tr. 498).  Deal's reported symptoms included: (i) anxiety; (ii) auditory and visual hallucinations; (iii) avoidance of trauma reminders and detachment from others; (iv) depressed mood; (v) foresight and telepathy; (vi) irritability and low frustration tolerance; (vii) impulsive drinking; (viii) low energy; (ix) panic attacks; (x) paranoia; and (xi) racing thoughts and rapid speech.  (Tr. 498).  She reported a history of alcohol and substance use, indicating that she consumed between 6-12 beers with shots daily and last consumed drugs in 2004.  (Tr. 499).  She reported that her last period of sobriety lasted from March 2013 to March 2014.  *See id.*  Nurse Practitioner Kauffman diagnosed Deal with alcohol dependence, PTSD, and schizoaffective disorder, depressive type, and suspect cluster B traits.  (Tr. 500).  Nurse Practitioner Kauffman prescribed medication and referred Deal to counseling.  *Id.*

On October 3, 2014, Deal reported to Nurse Practitioner Kauffman that she was "ok" and "pretty" stable with her prescribed medications.  (Tr. 537).  Deal reported fewer racing thoughts, less frequent auditory hallucinations, and no visual hallucinations and continued to report depressed mood.  *Id.*  She also reported that she moved in with her mother and was in an environment with less alcohol consumption, which she reported as two to three times per week.

(Tr. 537–38).  She also reported that she planned on attending Alcoholics Anonymous ("AA") meetings.  (Tr. 538).  Nurse Practitioner Kauffman adjusted Deal's medications.  *Id.*

On November 21, 2014, Deal was escorted by police to Fairview Hospital's emergency department.  (Tr. 509).  According to the attending nurse, a neighbor called 911 after seeing Deal wander about her apartment complex and Deal was brought to the hospital because her pulse rate was elevated.  (Tr. 509–10).  Deal reported that she had been drinking with a friend; she refused treatment; and she was discharged with a diagnosis of alcohol abuse.  (Tr. 509, 511–12).

On November 24, 2014, Deal reported to Nurse Practitioner Kauffman anxiety and depression.  (Tr. 539).  Deal reported that she felt "really overwhelmed," had spent "a lot of days" lying in bed, did not eat on some days, and was stressed because she was behind on her rent payments.  *Id.*  Deal reported that her anxiety and stress exacerbated her auditory hallucinations.  *Id.*  She denied alcohol or drug use.  (Tr. 540).  Nurse Practitioner Kauffman adjusted Deal's medication.  *Id.*

On March 30, 2015, Deal reported to Nurse Practitioner Kauffman that she had stopped taking Invega, which she took for her psychosis and mood, because of how it affected her menstruation.  (Tr. 500, 545).  Deal also reported depression, irritability, and command hallucinations which instructed her to hurt others.  (Tr. 545).  Nurse Practitioner Kauffman adjusted Deal's medication, adding Abilify.  (Tr. 546).

On July 28, 2015, Deal reported to Nurse Practitioner Kauffman that she had been in jail over the weekend for shoplifting.  (Tr. 867).  Deal reported that she heard a voice say "Go do it" in the lead-up to the crime.  *Id.*  She reported that she spoke to the walls and saw shadows while in jail.  *Id.*  And she reported increased anxiety.  *Id.*  Deal also reported only partial compliance with her medication: "There's days I've forgotten.  There's days that my mind tells me I don't

need them." *Id.* Deal denied substance use. (Tr. 868). Nurse Practitioner Kauffman encouraged Deal to comply with her medication and provided a pill box. *Id.*

On September 10, 2015, Deal reported to Nurse Practitioner Kauffman increased anxiety and depression, stating that things had been "just crazy." (Tr. 869). Deal requested new medication for her anxiety. *Id.* She denied substance use. *Id.* Nurse Practitioner Kauffman adjusted Deal's medication. (Tr. 870).

On September 21, 2015, Deal was brought to Fairview Hospital's emergency department in an unresponsive state following a cardiac arrest. (Tr. 672). Her family reported that Deal had been heavily drinking the night before and snorted Percocet. (Tr. 681). Lab testing was positive alcohol and cocaine. (Tr. 669). During a subsequent psychiatric consultation, Deal denied using either substance and stated that she only took Percocet for abdominal pain. (Tr. 686). Deal's mental status exam results were remarkable for: (i) not being oriented as to time and being only partly oriented to the situation; (ii) having broken eye contact; (iii) displaying upset mood; (iv) being irritable and "[d]ramatic" affect; (v) demonstrating an irritable and anxious tone; (vi) having tangential but redirectable thought process; (vii) thought content being preoccupied with obtaining Percocet; and (viii) having limited insight (minimization and projection). (Tr. 689–90). Deal was diagnosed with bipolar disorder and polysubstance abuse and recommended to participate in an intensive rehabilitation program. (Tr. 685–87). On September 28, 2015, Deal signed herself out of the hospital against medical advice. (Tr. 694–95).

On November 17, 2015, Deal reported to Nurse Practitioner Kauffman that she was doing "[a] little better I guess" but had worsening memory. (Tr. 871). Deal reported having cut her forearm one to two weeks before. *Id.* And she denied substance use. (Tr. 872). Nurse Practitioner Kauffman deferred medications until Deal saw a neurologist. *Id.*

On December 18, 2015, Deal reported to Nurse Practitioner Kauffman that she was "ok, I guess," but was stressed because the "building commission" wanted to board up her residence. (Tr. 873).  Deal also reported that her anxiety and depression had "been really heavy."  *Id.*  She denied substance use.  *Id.*  Nurse Practitioner Kauffman continued Deal's medication treatment. (Tr. 874).

On February 26, 2016, Deal reported to Nurse Practitioner Kauffman that she was "hanging in there."  (Tr. 877).  Deal reported that she had been in jail over an unpaid ticket and staying with a friend with whom she did not feel safe, because she "knocked out" if she mixed her medication with alcohol.  *Id.*  She also reported having cut her arm the previous month and "drinking ETOH regularly."  (Tr. 878).  Nurse Practitioner Kauffman encouraged Deal to stay sober, noting that her stressors and alcohol consumption impacted her symptoms.  *Id.*

On March 30, 2016, Deal arrived late to her appointment with Nurse Practitioner Kauffman, reporting "high anxiety" related to changes in the terms of her probation and other life stressors.  (Tr. 879–80).  She denied substance use.  (Tr. 879).  Nurse Practitioner Kauffman adjusted Deal's medication.  *Id.*

On April 5, 2016, Deal visited Southwest General Health Center for mental health treatment upon referral from her probation officer; Deal had recently tested positive for cocaine. (Tr. 721, 725–26).  Deal denied cocaine use in the previous month and reported her last alcohol use as March 7, 2016.  (Tr. 712, 718, 726).  Deal's mental status exam results were remarkable for "Hypertalkative" speech.  (Tr. 721–22).  Between April 5 and June 1, 2016, Deal received intensive outpatient treatment, consisting of individual and group therapy.  *See* (Tr. 700–16). Deal was ultimately discharged and referred to a residential level of care due to an inability to

consistently arrive on time and stay focused, as well as suspected self-harm behavior.  (Tr. 700); *see* (Tr. 707–10).

On May 5, 2016, Deal reported to Nurse Practitioner Kauffman that she'd been cutting her wrists over the previous several months and admitted herself to Southwest General Health Center.  (Tr. 881).  Deal reported that she'd also been taking more medication than prescribed. *Id.*  And she reported that she drank on days that she did not receive outpatient treatment.  (Tr. 882).  Nurse Practitioner Kauffman adjusted Deal's medication and started her on pillminders. *Id.*

On June 9, 2016, Deal reported to Nurse Practitioner Kauffman feeling "pretty content" after a lot of "good things" unfolded.  (Tr. 884).  Deal reported awaiting a bed to open up for inpatient substance use treatment.  *Id.*  She denied substance use.  *Id.*  Nurse Practitioner Kauffman continued Deal's medication treatment.  (Tr. 885).

On August 10, 2016, after missing one appointment and arriving too late to another, Deal reported to Nurse Practitioner Kauffman that she had fractured two of her ribs and was taking Percocet.  (Tr. 886–88).  Deal reported that she did not go through with inpatient treatment because of a conflicting sentencing hearing.  (Tr. 888).  She reported anxiety and depression rated at 6-7/10 in severity.  *Id.*  And Deal reported alcohol use "here and there" and drug use "about a month ago."  *Id.*  Nurse Practitioner Kauffman continued Deal's medication treatment. (Tr. 889).

On August 14, 2016, Deal visited the Fairview Hospital's emergency department following a motor vehicle accident.  (Tr. 796).  Deal reported that she struck two parked cars while attempting to flee her current and former boyfriends, whom she feared were going to

physically assault her.  *Id.*  Deal also reported having consumed one beer.  (Tr. 797).  She was discharged in stable condition.  (Tr. 799).

On September 15, 2016, Deal reported to Nurse Practitioner Kauffman that her mood was "up and down, and all over the place."  (Tr. 890).  Deal disclosed her traffic incident, reporting that she heard voices telling her to get into the car at the time.  *Id.*  She reported continued alcohol consumption, as well as Percocet use.  (Tr. 891).  Nurse Practitioner Kauffman adjusted Deal's medication.  *Id.*

On October 11, 2016, Deal reported to Nurse Practitioner Kauffman that she had been off her medication for a short time due to mail issues and that her mood was "all over the place." (Tr. 892).  She reported a pending sentencing hearing on "multiple OVIS" and intermittent auditory hallucinations which sometimes told her to hurt herself, sometimes she did not understand, and sometimes consisted of music.  *Id.*  She reported continued alcohol use, with her last use "a couple weekends ago."  (Tr. 893).  Nurse Practitioner Kauffman continued Deal's medication treatment.  *Id.*

On December 29, 2016, Deal reported to Nurse Practitioner Kauffman that she had not taken any of her medications since October because they made her nauseous when combined with antibiotics she was taking for her jaw and had since experienced increased anxiety and mood instability.  (Tr. 895).  She reported intermittent thoughts of self-harm.  *Id.*  She also reported recent alcohol use during Christmas.  *Id.*  Nurse Practitioner Kauffman adjusted Deal's medication.  (Tr. 896).

Between July 15 and September 4, 2018, Deal received treatment at Matt Talbot for Women pursuant to a court order that she complete a substance use residential treatment program.  (Tr. 1492).  At discharge, Deal was noted to have been sober for at least 30 days.  (Tr.

1493, 1495).  Deal's discharge diagnoses included: (i) alcohol use disorder; (ii) cannabis use disorder; (iii) stimulant use disorder; (iv) cocaine use disorder; and (vi) major depressive disorder, single episode.  (Tr. 1492–93).  Each was described as "Severe."  *Id.*  Deal refused residence in sober housing in favor of her parents.  (Tr. 1496).

On October 10, 2018, Deal visited Roseanne Bokor, LPN, reporting that she had been sober for six months, was living with her parents, and started a part-time job.  (Tr. 2103).  She reported that she still had "a lot" of anxiety and "some" depression.  *Id.*  Her mental status exam results were remarkable for blunted affect, restless motor activity, and anxious mood.  (Tr. 2104).  Nurse Bokor diagnosed Deal with a "mild episode of major depressive disorder" and refilled her medications.  *Id.*

On November 9, 2018, Deal visited David Brager, CNP, reporting that she had started a new job at Starbucks, was going to AA meetings and coordinating treatment, and had been sober for seven months.  (Tr. 2101).  She also reported "making some money by babysitting her girlfriend's kids."  *Id.*  And she reported increased anxiety, depression, and occasional irritability.  (Tr. 2102).  Her mental status exam results were remarkable for: (i) irritable and anxious behavior; (ii) restless motor activity; and (iii) anxious and nervous mood.  *Id.*  Nurse Practitioner Brager adjusted Deal's medication.  (Tr. 2101).

On December 20, 2018, Deal reported to Nurse Practitioner Brager that she was working close to 40 hours per week while attending AA meetings 3 times per week.  (Tr. 2099).  She also reported anxiety. *Id.*  Deal's mental status exam results were remarkable for: (i) anxious behavior; (ii) blunted affect; (iii) restless motor activity; (iv) rapid speech; and (v) anxious and nervous mood.  (Tr. 2100).  Nurse Practitioner Brager noted that Deal was "stable" with medication.  *Id.*

On March 29, 2019, Deal reported to Nurse Bokor that she was in a recovery program, had been sober for one year, and felt "stable on current medications." (Tr. 2097–98). She reported working part-time and attending AA meetings three times per week. (Tr. 2097). She also reported that she was less depressed but still had "a lot" of anxiety. *Id.* Deal's mental status exam results were remarkable for blunted affect. *Id.* Nurse Bokor diagnosed Deal with generalized anxiety disorder and bipolar disorder in partial remission. (Tr. 2098).

On May 1, 2019, after missing her last appointment, Deal reported to Nurse Bokor that she still worked at Starbucks, which had "been going well," but she was "very stressed and anxious." (Tr. 2095). She reported that she'd been sober for one year and was attending AA meetings four times per week. *Id.* Deal's mental status exam results were remarkable for: (i) anxious behavior; (ii) blunted affect; and (iii) anxious and nervous mood. (Tr. 2096).

On June 4, 2019, Deal reported to Nurse Practitioner Brager that she was 14 months sober, recently got her driver's license back, and continued to work at Starbucks. (Tr. 2093). She also reported "doing well" but was stressed over her partner, who had relapsed and was on Suboxone. (Tr. 2093, 2095). Deal's mental status exam results were unremarkable. (Tr. 2094).

On July 18, 2019, Deal reported to Nurse Practitioner Brager that she had been stressed over her partner's substance use and moved in with her mother. (Tr. 2091). She reported that she was 15 months sober and met with her probation officer and counselor weekly. *Id.* Deal's mental status examination results were remarkable for anxious mood. (Tr. 2092).

On August 27, 2019, Deal reported to Nurse Bokor "high anxiety" and requested an increase in her medication. (Tr. 2089). Deal reported that she had been "very stressed," because bother her current and former partners were using drugs and one had a warrant for his arrest. *Id.* She reported that she had been sober for 17 months. *Id.* Deal's mental status exam results were

remarkable for: (i) anxious and depressed mood; (ii) blunted affect; (iii) mildly impaired cognition and judgment; and (iv) moderate insight.  (Tr. 2090).  Nurse Bokor adjusted Deal's medication.  *Id.*

On October 7, 2019, Deal reported to Nurse Practitioner Brager that she was "17" months sober but was under "a lot of stress with her girlfriend," whom Deal was assisting to detoxify. (Tr. 2087).  Deal also reported that her mother, in whose house Deal resided, had alcohol.  *Id.* Deal's mental status exam results were remarkable for anxious mood, moderate insight, and mildly impaired judgment.  (Tr. 2088).

On November 8, 2019, Deal, who was "very late" for her appointment, reported to Nurse Practitioner Brager that her anxiety was "off the roof."  (Tr. 2085).  Deal reported that she was going to Florida with her aunt to assist her cousin.  *Id.*  Deal's mental status exam results were remarkable for anxious mood, moderate insight, and mildly impaired judgment.  (Tr. 2086). Nurse Practitioner Brager noted that Deal was "[s]table" with medication.  *Id.*

On December 10, 2019, Deal reported to Nurse Practitioner Brager that she went to Florida for ten days, during which she attended two sober clubs.  (Tr. 2083).  Deal reported that she got a new job at a different "[d]onut shop" and was working close to 40 hours per week.  *Id.* She also reported approaching two years of sobriety and that her partner was sober.  *Id.*  Deal's mental status exam results were remarkable for moderate insight and mildly impaired judgment. (Tr. 2084).

On December 23, 2019, Deal reported to Nurse Practitioner Brager that she lost her job because "too many people were hired" but was "doing well with probation."  (Tr. 2081).  Deal's mental status exam results were remarkable for anxious and depressed mood, moderate insight,

and mildly impaired judgment.  (Tr. 2082).  Nurse Practitioner Brager noted that Deal was "stable" with medication.  *Id.*

On February 7, 2020, Deal reported to Nurse Bokor that she had graduated from drug court, she had been sober for two years, and was "doing very well."  (Tr. 2079).  Deal denied any adverse symptoms.  *Id.*  Deal's mental status exam results were remarkable for blunted affect, mildly impaired cognition, and moderately impaired judgment.  (Tr. 2080).

On February 24, 2020, Deal reported to Nurse Practitioner Brager that she was stressed, and her nerves were "shot," stating that her partner chronically relapsed, her finances were "very tight," and her mother was a "heavy drinker."  (Tr. 2077).  Her mental status exam results were remarkable for anxious and irritable mood, moderate insight, and mildly impaired judgment. (Tr. 2078).

On March 24, 2020, Deal reported to Nurse Practitioner Brager in a telehealth appointment that she was sober, attending online meetings, and keeping herself busy by helping her mother.  (Tr. 2075).  Deal reported that her sponsor had found her a job at McDonald's, where she planned to work once things went back to normal, and that she was doing "some work that she can for friends to make some income during this time."  (Tr. 2073–74).  Deal also reported increased anxiety and that her mood was "all over the place," stating that Deal's partner had chosen heroin over her children and Deal.  (Tr. 2075).  Deal's mental status exam results were remarkable for anxious and irritable mood, moderate insight, and mildly impaired judgment.  (Tr. 2076).  Nurse Practitioner Brager discussed with Deal the possibility of ADD medication.  *Id.*

On April 28, 2020, Deal attended a telehealth appointment with Jennifer R. Mlady, APRN, CNP.  (Tr. 2071).  Deal reported that were mood was "overall stable" but had "high

13

anxiety" associated with psychosocial stressors.  (Tr. 2071–72).  Nurse Practitioner Mlady diagnosed Deal with generalized anxiety disorder and refilled her medication.  (Tr. 2072–73).

On October 2, 2020, Deal reported to Nurse Practitioner Brager in a telehealth appointment that she'd been "doing okay" and was "clean again after a lapse."  (Tr. 2069).  Deal reported that her finances had been "really tight" and had been "working some."  *Id.*  Deal's mental status exam results were remarkable for anxious mood, moderate insight, and mildly impaired judgment.  (Tr. 2070).  Nurse Practitioner Brager recommended intensive outpatient treatment.  *Id.*

On November 6, 2020, Deal attended a telehealth appointment with Youstina Soliman, APRN, CNP, reporting anxiety and depression but no substance use since her last visit.  (Tr. 2066).  Deal's mental status exam results were remarkable for anxious mood and mildly impaired judgment.  (Tr. 2067).  Nurse Practitioner Soliman continued Deal's medication treatment.  (Tr. 2067–68).

On December 9, 2020, Deal reported to Nurse Practitioner Brager in a telehealth appointment that she had been sober for four to five months, though she was "struggling at times."  (Tr. 2062–64).  She reported staying mostly at home and that she wanted an assessment for substance use disorder.  (Tr. 2062).  She reported that she needed treatment if she wanted to see her ex-partner's children.  *Id.*  Deal's mental status exam results were remarkable for anxious mood.  (Tr. 2063).

On February 9, 2021, Deal reported to Nurse Practitioner Brager in a telehealth appointment that she had increased anxiety due to housing issues.  (Tr. 2058, 2060).  She reported that she was staying with a friend in an extended stay hotel and needed a place to live.  (Tr. 2059).  She also reported that she had been arguing with that friend and that her car had been

14

solen by her ex-partner.  (Tr. 2058–59).  Deal's mental status exam results were remarkable for anxious and irritable mood.  (Tr. 2059–60).  Nurse Practitioner Brager referred Deal to substance use treatment.  (Tr. 2060).

Between March 10 and May 10, 2021, Deal received outpatient treatment at Circle Health Services, consisting of telehealth group counseling, individual counseling, and case management.  (Tr. 2026–55).  Deal reported her last sober date as October 8, 2020.  (Tr. 2026).  Throughout this period, she reported feeling frustrated, overwhelmed, stressed, and tired.  *See* (Tr. 2026–27, 2029, 2031–32, 2034–38, 2040–44, 2046–49, 2051).

On May 17, 2021, Deal reported to Nurse Practitioner Brager in a telehealth appointment that she had relapsed and was using alcohol and marijuana.  (Tr. 2251).  She reported that she was receiving government medical assistance, food stamps, and unemployment and had borrowed money from her parents.  *Id.*  She also reported that someone fraudulently filed a Form W-2 in her name and was experiencing anxiety.  (Tr. 2251–52).  Deal's mental status exam results were remarkable for anxious and depressed mood.  (Tr. 2252–53).  Nurse Practitioner Brager again referred Deal to substance use treatment.  (Tr. 2253).

On July 16, 2021, Deal attended a telehealth appointment with Maggie K. Sturm, PharmD. (Tr. 2337).  Deal reported experiencing "a lot of depression and panic attacks" at least once per day because of her current situation: (i) she and her ex-partner were victims of identity theft; (ii) she was never paid for "desk work" she performed; and (iii) her ex-partner was in jail. *Id.*  She reported being "more forgetful."  *Id.*  And she reported substance use, drinking alcohol "more than I should" and using marijuana up to three times per week.  (Tr. 2337–38).

On September 22, 2021, Deal reported to Nurse Practitioner Brager in a telehealth appointment that she was at the buffet of a casino, where she went to distract herself from

15

substance use.  (Tr. 2319–20).  She reported that her mood had been "fair," but her substance use had been "problematic."  (Tr. 2320).  She also reported anxiety.  *Id.*  Deal's mental status exam results were remarkable for anxious mood and restless behavior.  (Tr. 2321).  Nurse Practitioner Brager referred Deal to substance use treatment.  (Tr. 2321–22).

On November 19, 2021, Deal attended a telehealth appointment with Judith Amicone, LICDC, for a mental health assessment.  (Tr. 2292–93).  Deal reported that she had recently detoxed and wanted to reenter treatment for substance use.  (Tr. 2293).  She reported her last substance use as: (i) November 16, 2021 for alcohol; (ii) January 1, 2017 for cocaine; (iii) November 22, 2021 for marijuana; and (iv) November 21, 2021 for methamphetamine.  (Tr. 2296–97).  Her reported mental health symptoms included: (i) auditory hallucinations; (ii) excessive talking and poor listening; (iii) fatigue; (iv) flashbacks, intrusive memories, and nightmares; (v) forgetfulness and distractibility; (vi) inattention and impatience; (vii) irritability and interrupting of others; (viii) poor concentration; (ix) restlessness; and (x) sadness.  (Tr. 2300).  She also reported not taking her medication properly.  (Tr. 2293).  Amicone diagnosed Deal with severe alcohol and methamphetamine use disorder and recommended intensive outpatient services.  (Tr. 2296, 2298).

On December 8, 2021, Deal reported to Nurse Practitioner Brager in a telehealth appointment that she did not start intensive outpatient treatment because she got "overwhelmed." (Tr. 2278–79).  She also reported consuming alcohol after Thanksgiving and a recent charge for operating a vehicle while under the influence ("OVI") of marijuana, for which she had a license and used to treat anxiety and panic.  (Tr. 2279).  Deal's mental status exam results were remarkable for anxious and depressed mood and mildly impaired judgment.  (Tr. 2280).  Nurse Practitioner Brager referred Deal to substance use treatment.  *Id.*

On March 7, 2022, Deal reported to Nurse Practitioner Brager in a telehealth appointment that she had moved to a new place.  (Tr. 2265–66).  She reported having consumed alcohol, amphetamines, and marijuana.  (Tr. 2266).  She also reported anxiety, trauma related to having discovered one of her cats dead, and a third OVI charge for marijuana.  (Tr. 2266–67).  Her mental status exam results were remarkable for anxious mood.  (Tr. 2267).

### C.     Relevant Opinion Evidence

### 1.     Consultative Examiner – Richard N. Davis, MA

On February 10, 2015, Deal visited Richard N. Davis for a consultative examination. (Tr. 525).  Deal reported that her day consisted primarily of lying in bed, sleeping, and watching television.  (Tr. 529).  She reported that she could microwave things, do laundry, and clean but could not do dishes.  *Id.*  She reported that she bathed and changed clothes every three days.  *Id.* She also reported reading, watching television, and grocery shopping by herself.  *Id.*  In describing her past work, Deal reported that she last worked for Dunkin Donuts in October 2013, from which she was fired because she worked too slowly, showed up late, and was an irresponsible employee.  (Tr. 527).  Deal further reported auditory hallucinations, crying spells, bodily shakes attributed to anxiety, anxiety attacks, paranoia, and impulsivity.  (Tr. 527–28). Deal's mental status exam results were remarkable for: (i) appearing depressed; (ii) responding to questions "extremely slowly"; (iii) excessive worry; and (iv) limited ability to think logically and use common sense judgment.  (Tr. 527–29).

Psychologist Davis diagnosed Deal with bipolar disorder, depressed, severe.  (Tr. 530). He opined that Deal: (i) could understand, remember, and carry out instructions but was too depressed to put them into action; (ii) had difficulty paying attention and concentration; (iii) self-

reported trouble getting along with supervisors; and (iv) self-reported not responding well to stress and pressure.  (Tr. 529–30).

### 2.    Treating Source – Kelley Kauffman, CNP

On March 31, 2015, Nurse Practitioner Kauffman completed a two-page questionnaire on Deal's "Mental Status."  (Tr. 533–34).  Nurse Practitioner Kauffman stated that Deal's most recent mental status exam was remarkable for: (i) irritable and depressed mood; (ii) labile affect; (iii) self-reported panic attacks, command hallucinations, and intermittent paranoia; (iv) moderately impaired concentration; (v) mildly impaired short- and long-term memory; and (vi) moderately impaired judgment.  (Tr. 533).

Nurse Practitioner Kauffman opined that Deal: (i) was able to remember and follow simple instructions; (ii) was easily distractable, playing with phone during the session; (iii) was easily distracted and frustrated with simple tasks; (iv) had low frustration tolerance; and (v) had a poor capacity to cope with change. (Tr. 534).  Nurse Practitioner Kauffman further opined that it was unclear how Deal would react to the pressures involved in simple and routine tasks because Deal was poorly managed with medication and continued to have symptoms impacting her daily functioning and judgment.  *Id.*

### 3.    Treating Source – David Brager, CNP

On March 25, 2022, Nurse Practitioner Brager completed a two-page questionnaire on Deal's mental impairments, consisting of eight short-answer questions and one checklist question.  (Tr. 2360–61).  In answering the short-answer questions, Nurse Practitioner Brager described: (i) Deal's frequency and length of contact with him; (ii) Deal's diagnoses (i.e., bipolar disorder and PTSD) and medications; and (iii) clinical findings that demonstrated the severity of Deal's impairments (i.e., racing thoughts, severe depressive episodes, and mood swings).  (Tr.

18

2360).  When asked how often Deal would be absent from work due to her impairments, Nurse Practitioner Brager answered: "unable to work with consistency."  (Tr. 2361).  And in response to how often Deal's mental impairments would cause her to be off-task, Nurse Practitioner Brager answered: "multiple days in a week would not be in or unable to stay due to anxiety."  *Id.*

The checklist-answer question asked Nurse Practitioner Brager to describe Deal's ability to perform work-related tasks within four functional areas on a five-point scale: (i) "Unlimited or Very Good"; (ii) "Limited but satisfactory"; (iii) "Seriously limited but not precluded"; (iv) "Unable to meet competitive standards"; and (v) "No useful ability to function."  (Tr. 2360–61).  With respect to sustained concentration and persistence, Nurse Practitioner Brager stated that: (i) Deal was "Limited but satisfactory" in her ability to sustain an ordinary routine without special supervision; (ii) Deal was "Unable to meet competitive standards" in her ability to work in coordination with or in proximity to others without being distracted by them; (iii) Deal both was "Unable to meet competitive standards" and had "No useful ability to function" as to her ability to complete a normal workday and workweek without interruption from her symptoms; and (iv) Deal had "No useful ability to function" as to her ability to (a) maintain attention and concentration for extended periods, (b) perform activities within a schedule, (c) manage regular attendance and be punctual within customary tolerances, and (d) perform at a consistent pace without an unreasonable number and length of rest periods.  *Id.*

With respect to understanding and memory, Nurse Practitioner Brager stated that: (i) Deal both was "Unable to meet competitive standards" and had "No useful ability to function" in her ability to remember locations and work-like procedures; (ii) Deal was "Unable to meet competitive standards" in her ability to remember very short and simple instructions; and

(iii) Deal had "No useful ability to function" in her ability to understand and remember detailed instructions.  (Tr. 2361).

With respect to social interaction, Nurse Practitioner Brager indicated that: (i) Deal was "Seriously limited, but not precluded" in her ability to ask simple questions or request assistance and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (ii) Deal "Unable to meet competitive standards" in her ability to interact appropriately with the general public"; (iii) Deal both was "Unable to meet competitive standards" and had "No useful ability to function" in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (iv) Deal had "No useful ability to function" in her ability to accept instructions and respond appropriately to criticism from supervisors.  *Id.*

Last, with respect to adaptability, Nurse Practitioner Brager opined that: (i) Deal was "Seriously limited, but not precluded" in her ability to be aware of normal hazards and take appropriate precautions; (ii) Deal was "Unable to meet competitive standards" in her ability to respond appropriately to changes in a work setting; and (iii) Deal had "No useful ability to function" to set realistic goals or make plans independently of others.  *Id.*

### D.    Third-Party Statements

#### 1.    Arielle Dipre – Case Manger

On January 9, 2015, Arielle Dipre, Deal's case manager, reported on Deal's activities of daily living.  (Tr. 522).  Dipre reported that Deal could make "box meals" or "microwave dinners."  (Tr. 523).  Dipre also reported that: (i) Deal was ineffective in doing household chores due to feeling overwhelmed; (ii) Deal showered every two days; (iii) Deal did not shop; (iv) Deal relied on others for transportation and was often forgetful or late; and (v) Deal could get along

"fairly well" with family and friends.  (Tr. 522–23).  Dipre reported that Deal visited family

monthly and friends twice weekly, talking and watching television.  (Tr. 522).  Dipre reported

that Deal had previously been disciplined for frequent tardiness and calling off work.  *Id.*  And

Dipre reported that Deal had poor stress tolerance.  *Id.*

### 2. Karl A. Kelly – Fiancé

On March 13, 2015, Karl A. Kelly, Deal's fiancé, also reported on Deal's activities of

daily living.  (Tr. 394–95).  Kelly reported that: (i) Deal needed reminders to maintain hygiene;

(ii) Deal could only prepare microwave meals; (iii) Deal often neglected household chores due to

a combination of distractions, lack of attention, and inability to complete tasks; (iv) Deal was

unable to drive or use public transportation due to panic attacks; (v) Deal relied on the assistance

of others for transport and grocery shopping; (vi) Deal's interests were cats and children;

(vii) Deal responded to stress with panic, poor decision-making, tunnel vision, and use of social

media to escape; and (viii) Deal had expressed concerns about shadows and sounds not actually

present.  *Id.*

### E. Function Report

On August 12, 2015, Deal completed a report describing the impact of her impairments

on her ability to function.  (Tr. 415–22).  Deal reported that her mental health impairments

rendered her unable remember, concentrate, complete tasks, understand and follow instructions,

and get along with others.  (Tr. 420).  She reported that she was unable to concentrate more than

a few minutes at a time, would constantly dwell on past bad experiences, had daily panic attacks,

and spent most days bedridden and reliving past traumas.  (Tr. 415–16, 420, 422).  She reported

that she cared for four cats but had to be reminded constantly by her fiancé to clean up after

them.  (Tr. 416).  She reported no difficulty with personal care and hygiene, except that she did

not care what she looked like, did not eat properly, and needed reminders.  (Tr. 416–17).  She reported that she could wash dishes and do laundry, though her anxiety and depression made it take "very long."  (Tr. 417).  She reported that her fiancé did all the cooking.  *Id.*  She reported that her hobbies consisted of watching television and spending time with her fiancé.  (Tr. 419).

Deal also reported that she went outside periodically but needed someone with her to stay calm.  (Tr. 418).  She could grocery shop but only seldomly and needed help to focus and calm down.  *Id.*  She reported that she could not drive due concentration issues and anxiety.  *Id.*  She reported that she was able to pay bills, count change, handle a savings account, and use a checkbook.  *Id.*

### F.       Relevant Testimonial Evidence

#### 1.       March 2017 Administrative Hearing

Deal testified at the March 2017 administrative hearing that she dropped out of college after two years because of the impact of her mental impairments on her grades.  (Tr. 65).  She testified that she subsequently was unable to hold a job because of her anxiety, which caused her to arrive late and work slowly.  (Tr. 66–67).  She that she self-medicated with alcohol and marijuana; her symptoms were worse while sober: daily auditory hallucinations and shaking.  (Tr. 68–69, 73).  She testified that she last consumed alcohol the previous summer.  (Tr. 67–68).  And she testified that she last cut herself two months before the hearing.  (Tr. 72).

Deal testified that she spent most of the day in bed and rarely left house, because her anxiety urged her to go home.  (Tr. 70).  She testified that when her anxiety was triggered, she lacked the motivation to get out of bed, which occurred four to five times per week.  (Tr. 70–71).  She testified that on days that she felt better she could do half the dishes at one time or attend

laundry that had been sitting in the machines for two days.  (Tr. 74).  She testified that she sometimes got distracted midway through a task and fail to complete it.  (Tr. 75).

Vocational expert ("VE") Thomas Limberger testified that if a hypothetical person exhibited more than 20% off-task behavior, the individual would not be able to work.  (Tr. 76, 78).

### 2.    February 2019 Administrative Hearing

Deal testified at the February 2019 administrative hearing that she started working for Starbucks in October 2018 between 20-25 hours per week washing dishes and preparing beverages.  (Tr. 38–40, 45, 47); *see* (Tr. 1554–55).  Deal testified that her employer was very accommodating of the way in which her impairment affected her work performance: (i) remaking beverages multiple times due to lapses in memory; (ii) chronic tardiness; (iii) regular five-to-ten-minute breaks to wait out crowds; and (iv) unfinished tasks.  (Tr. 41–42, 44–49).  Deal testified that she was between ten minutes to an hour late every day, because she would have panic and racing thoughts.  (Tr. 42–43).  She testified that she was more anxious at work than at home.  (Tr. 45).  She also testified that her anxiety made her struggle with following through with appointments.  (Tr. 49).  She testified that at home her room was a "mess" and she often forget to finish a load of laundry. (Tr. 43).  She testified that the most she could cook was prepare microwave food or "minimal cooking, stuff that takes five, ten minutes to cook."  *Id.* And she also testified she had not used any substance in almost a year.  (Tr. 51).

VE Ted Macy testified that if a hypothetical individual were 15 minutes late on a regular basis, they would be unable to find employment in a competitive setting.  (Tr. 52–54).  The VE testified that 20% off-task behavior would also be work preclusive.  (Tr. 54).

### 3. April 2022 Administrative Hearing

Deal testified at the April 2022 administrative hearing that she had worked part-time for McDonalds just before the Covid-19 pandemic, but she could not recall the number of hours. (Tr. 1553–54).  Deal testified that she worked nearly full-time at Starbucks until 2019.  (Tr. 1554–55, 1569).  She testified that she was only able to hold on to that job as long as she did because the manager was accommodating of her impairments.  (Tr. 1569–70).  After they changed managers, Deal lost her job.  (Tr. 1570).

Deal testified that her primary barrier to employment was her anxiety.  (Tr. 1557).  She testified that she sometimes had daily panic attacks lasting 5-20 minutes which disabled her from timely showing up for work.  (Tr. 1557–58).  She testified that her panic attack symptoms included racing thoughts and accelerated heartrate.  (Tr. 1558).  She testified that her anxiety was triggered by needing to be somewhere or being "overwhelmed with too many things going on." (Tr. 1559).  She managed her anxiety by walking away to be by herself, as well as medication and counseling.  *Id.*  She testified that even with medication, she never got to the point where she could maintain full-time employment.  (Tr. 1560).

Deal testified that she had been sober for about a year and a half, which did not account for marijuana use as she had a medical marijuana license.  (Tr. 1562–63).  Deal also testified that she seldom went out to the casino, and when she did it was at a late hour with few patrons.  (Tr. 1564–65).

VE Helen Topcik testified that a hypothetical individual with the ALJ's proposed limitations would be able to perform work at the sedentary exertion level as a general office clerk, at light exertion level as a laundry sorter, and at the medium exertion level as an industrial

cleaner.  (Tr. 1570, 1575–77).  The VE testified that off-task behavior greater than 10% or more than one regular absence per month would be work preclusive.  (Tr. 1577–78).

### III.    Law & Analysis

#### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *Id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

#### B.    Step Four – Materiality of Substance Use

Deal argues that the ALJ failed to apply proper legal standards in his evaluation of whether Deal's substance use was material to the determination of her disability.  ECF Doc. 12 at 14–19.  Deal argues that the ALJ erred because his materiality finding was made without the benefit of opinion evidence on the issue and, therefore, based on the ALJ's lay interpretation of medical records he was not qualified to interpret.  ECF Doc. 12 at 17.  Deal argues that the ALJ failed to account for treatment records from periods of sobriety with negative mental status exam

findings and subjective reports of anxiety and unstable mood. ECF Doc. 12 at 18–19. And Deal argues that the ALJ failed to adequately explain how her symptoms improved during periods of sobriety to the point that she was not disabled, given that the ALJ's two RFC findings differed only with respect to absenteeism. ECF Doc. 12 at 19. The Commissioner disagrees. ECF Doc. 14 at 14–21.

A disability claimant is not eligible for benefits "if alcoholism or drug addiction would . . . be a contributing material factor to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C); 1382c(a)(3)(J). Thus, if the ALJ finds a claimant *with* a substance use disorder to be disabled, the regulations require the ALJ to repeat the sequential evaluation process and determine whether the claimant would still be disabled if she abstained. *Johnson-Hunt v. Comm'r of Soc. Sec.*, 500 F. App'x 411, 415 (6th Cir. 2012) (citing 20 C.F.R. § 416.935(b)(1)); *see also* SSR 13-2p, 2013 SSR LEXIS 2, at *13–15 (2013). The ALJ must evaluate: (i) whether the limitations upon which he reached his previous finding of disability would remain if the claimant stopped using drugs or alcohol; and (ii) whether the remaining limitations would be disabling. 20 C.F.R. § 416.935(b)(2). In undertaking this analysis, the ALJ "must provide sufficient information so that a subsequent reviewer considering all of the evidence in the case can understand the reasons" for his materiality findings. SSR 13-2p, 2013 SSR LEXIS 2, at *41–42.

The ALJ failed to apply proper legal standards in his evaluation of the materiality of Deal's substance use disorder. 42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405. The ALJ complied with the regulations to the extent that he: (i) determined that the limitations imposed by Deal's impairments, including her substance use disorder, would render her disabled; (ii) repeated the sequential evaluation process to determine whether Deal's substance abuse disorder was material

to her disability; and (iii) concluded that abstention would result in RFC findings that would not preclude Deal from work. 20 C.F.R. § 416.935(b)(1); SSR 13-2p, 2013 SSR LEXIS 2, at *13–15; (Tr. 1515–31).  Under the regulations, the ALJ was permitted to make the materiality finding without the benefit of opinion evidence on the issue.  SSR 13-2p, 2013 SSR LEXIS 2, at *26 ("To support a finding that DAA is material, we must have evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA.  Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder.").  And other than her bare assertion, Deal has not stated – other than the opinion evidence – in what way the ALJ made improper lay medical findings. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1989).

However, the court finds merit in Deal's challenge to the adequacy of the ALJ's explanation for his materiality determination.  When the ALJ revisited his RFC analysis to determine the impact of Deal's substance use disorder, his RFC findings were identical in all respects but one: he did not find that Deal "would be absent from work one day a week." *Compare* (Tr. 1515), *with* (Tr. 1530).  What explains the difference is not clear from the ALJ's decision.  The ALJ's rationale for finding absenteeism in the first place is unexplained, his initial RFC analysis consisting only of a summary of the medical evidence followed by the conclusion that Deal's subjective symptom complaints were consistent with the evidence. *See* (Tr. 1515–19).  By contrast, the ALJ concluded his second RFC analysis by stating:

> [Deal's] allegations are partially consistent with respect to the nature of her symptoms.  However, her allegations that her symptoms are so severe that she cannot perform work at substantial gainful activity levels are not consistent in light of the evidence of record and activities consistent with the ability to perform a range of work.  [Deal] alleged disability due to PTSD, bipolar, schizoaffective disorder, pancreatitis, and knee issues.  Although the undersigned found [Deal] to

27

have severe impairments they are not work preclusive, unless she is engaging in substance abuse.  Evidence of record regarding [Deal's] daily activities is consistent with a residual functional capacity for work.  She can prepare meals, pay bills, shop, drive, spend time with others, live with others, watch TV, use the internet, handle self-care and personal hygiene, care for pets, and help care for children.  However, to the extent that she is self-limited, this does not in itself establish a medical or pathological basis for such restrictions, nor is the record consistent with her alleging an incapacity for all sustained work activity.  There is no evidence that [Deal's] use of prescribed medication is accompanied by side effects that would interfere significantly with her ability to perform work within the restrictions outlined in this decision.  In summary, the evidence does not corroborate [Deal's] allegations of symptoms attributed to her impairments to an extent that would preclude the performance of work with the restrictions stated above.

(Tr. 1530).

The ALJ's stated reasons failed to build an accurate and logical bridge between the evidence and his implicit conclusion that Deal would have no absenteeism limitation while sober.  *Fleischer*, 774 F. Supp. 2d at 877.  Relevant to the materiality analysis is the extent to which limitations remain present during periods of abstinence.  SSR 13-2p, 2013 SSR LEXIS 2, at *33–35.  There is support in the record for the contention that Deal had attendance issues even during periods of sobriety which were attributable to her anxiety, such as: (i) Deal's statement that she was fired from her full-time employment at Dunkin Donuts in October 2013 in part because she "shows up late" (Tr. 522); (ii) Deal's testimony that, despite her ability to obtain employment, she was unable to maintain it due to chronic tardiness (Tr. 66–67); and (iii) Deal's testimony that, although she was worked nearly full-time for Starbucks between 2018 and 2019, she was always late, which was tolerated only due to special accommodation from her manager (Tr. 38, 41–42, 46–49, 1569–70).  Deal continued to report anxiety and display anxious behavior to her treatment providers during her most prolonged periods of sobriety.  (Tr. 2076, 2078, 2082, 2086, 2088–89, 2092, 2095–97, 2099–100, 2102–04).  And the record reflects absences and late arrivals to appointments during the same period.  (Tr. 2085, 2095).

28

The activities of daily living the ALJ cited are not necessarily inconsistent with Deal's subjective statements that her anxiety resulted in chronic tardiness.  Microwaving food, paying bills, occasional grocery shopping, driving, watching television, and using the internet would not be inconsistent with anxiety-induced panic attacks which Deal contended prevented her from leaving the house in a timely fashion.  Nor would her ability to live and spend time with others.  The same goes for Deal's ability to handle self-care, maintain personal hygiene, care for four cats, and babysit.  These activities do not speak to Deal's ability to timely report to a work setting on a regular and continuing basis when not using alcohol or drugs.  *See* SSR 96-8, 1996 SSR LEXIS 5, at *5 (July 2, 1996) (stating that an RFC reflects the most a claimant can do in a 40-hour workweek).  The only other reason the ALJ gave to support his second RFC findings, it seems, was that the evidence was inconsistent such a limitation.  *See* (Tr. 1530).  The one-sentence statement, however, did not explain in what way an absenteeism limitation that was warranted initially would not be if Deal were to stop using drugs or alcohol.

The Commissioner argues at length that evidence referenced in the ALJ's summary of the evidence supported his conclusion the absenteeism was not warranted when taking into account Deal's substance use disorder.  But the existence of substantial evidence to support the ALJ's decision on the ultimate issue of disability is no substitute for the ALJ's failure to clearly articulate logically coherent reasons we can independently review.  *See Fleischer*, 774 F. Supp.2d at 878; SSR 13-2p, 2013 SSR LEXIS 2, at *41–42.  We cannot accept the Commissioner's after-the-fact arguments in lieu of the ALJ's own stated reasons for his findings.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983).  And we cannot overlook the error as harmless, as the presence of the absenteeism limitation was dispositive of the ALJ's disability determination.  Thus, a remand is warranted to permit the ALJ

29

to revisit his materiality analysis and explain with greater care his reasons for why Deal's substance use disorder is material to an RFC finding of absenteeism or how, if Deal were not using substances, her history demonstrated an ability to avoid absenteeism.

### C.    Step Four – Opinion Evidence

Deal argues that the ALJ failed to apply proper legal standards when he gave "little" weight to Nurse Practitioner Brager's opinion on absenteeism. ECF Doc. 12 at 21–25. Deal argues that the ALJ erred by not acknowledging or discussing how he considered the regulatory factors. ECF Doc. 12 at 21–22. Deal argues that the ALJ failed to build an accurate and logical bridge between the evidence and the reasons he gave for discounting Nurse Practitioner Brager's opinion. *See* ECF Doc. 12 at 22–23. And Deal argues that the ALJ made an improper lay medical finding that Deal would only be off task when consuming alcohol. ECF Doc. 12 at 24. The Commissioner disagrees. ECF Doc. 15 at 21–25.

The regulations applicable to Deal's applications required that the ALJ consider and assign weight to every medical opinion in the record. 20 C.F.R. § 416.927(c). If the opinion comes from a treating source, the ALJ must give it controlling weight so long as it was supported by clinical and laboratory diagnostic evidence and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2). If the ALJ does not give the treating source's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6). And the ALJ must provide "good reasons" for the weight assigned to the treating source's opinion if he does not give it controlling weight. *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017).

However, under the law in effect in this case, nurse practitioners were not considered "acceptable medical sources" to whom the treating source rule applied.  20 C.F.R. § 416.902(a); 20 C.F.R. § 416.913(d)(1) (2014); SSR 06-03p, 2006 SSR LEXIS 5, at *4 (2006).  Thus, an ALJ was not required to give "good reasons" for discounting a nurse practitioner's opinion.  *E.g.*, *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010); *Pruitt v. Comm'r of Soc. Sec.*, No. 1:16 CV 2927, 2018 U.S. Dist. LEXIS 49512, at *44 (N.D. Ohio Mar. 26, 2018); *Whitaker v. Comm'r of Soc. Sec.*, No. 1:14-cv-1090, 2016 U.S. Dist. LEXIS 33556, at *14 (W.D. Mich. Mar. 16, 2016).  The ALJ was instead required to evaluate the opinion under the regulatory factors and provide sufficient explanation for a reviewing court to follow his reasoning.  SSR 06-03p, 2006 SSR LEXIS 5, at *11, 15–16.

The ALJ failed to apply proper legal standards in his evaluation of Nurse Practitioner Brager's opinion.  42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405.  The ALJ complied with the regulations to the extent he considered and assigned weight to Nurse Practitioner Brager's opinion.  SSR 06-03p, 2006 SSR LEXIS 5, at *15.  Although the ALJ referred to Nurse Practitioner Brager as a "treating source" and Deal argues error in the application of the treating source rule to his opinion, the treating source rule did not apply to opinions issued by nurse practitioners at the time.  20 C.F.R. § 416.902(a); 20 C.F.R. § 416.913(d)(1) (2014); SSR 06-03p, 2006 SSR LEXIS 5, at *4; ECF Doc. 12 at 15, 21; (Tr. 1529).  The ALJ also was not required to explain how he considered each of the regulatory factors.  *Tabor v. Comm'r of Soc. Sec.*, No. 1:16-cv-2971, 2018 U.S. Dist. LEXIS 44552, at *11–12 (N.D. Ohio Mar. 18, 2018).  All that was required was that the decision reflects that the regulatory factors were considered, and a review of the ALJ's stated reasons for the weight assigned confirm that he did.  *Edwards v.*

*Comm'r of Soc. Sec.*, No. 1:14-cv-0832, 2016 U.S. Dist. LEXIS 590, at *16 (W.D. Mich. Jan. 5, 2016); *see* (Tr. 1529) (discussing supportability and consistency).

And, even though not required to articulate "good reasons" for discounting the opinion of the nurse practitioner, the ALJ clearly articulated the reasons for why he gave Nurse Practitioner Brager's opinion little weight:

> The undersigned assigns little weight to this opinion because it is not supported by the evidence of record.  The record does not support any marked or extreme limitations.  Mental status examinations have been essentially normal (Exhibit 35, pp. 13, 26, 59, 67).  By [Deal's] own statements, she can prepare meals, pay bills, shop, drive, spend time with others, live with others, watch TV, use the internet, handle self-care and personal hygiene, care for pets, and help care for children.  The only time [Deal] would be off-task is when she is consuming alcohol.  A finding that an individual is "disabled" or "unable to work," is an administrative finding and is an issue reserved to the Commissioner. . . .  Opinions on these issues must not be disregarded; but they cannot be entitled to controlling weight or even given special significance, even when offered by a treating source . . . .  Mr. Brager did not provide objective data or clinical findings to support this opinion.

(Tr. 1529).

However, these reasons do not suffice to reject Nurse Practitioner Brager's opinion on absenteeism.  Unremarkable mental status exam findings of how Deal presented herself in a clinical setting are not necessarily inconsistent with the degree to which Deal's symptoms affected her attendance and proclivity for off-task behavior in a work setting.  As discussed above, the activities of daily living the ALJ cited do not speak to Deal's ability to timely report to a work setting on a regular and continuing basis when she was not using alcohol or drugs.  *See* SSR 96-8, 1996 SSR LEXIS 5, at *5.  And the ALJ's finding that Deal would *only* be off task when sober stands alone, without citation to supporting evidence or an explanation.  By contrast, an opinion that Deal displayed off-task behavior during periods sobriety would be consistent with Deal's subjective symptom complaints.  (Tr. 38, 41–42, 46–49, 1569–70).

The ALJ's finding that opinions on a claimant's inability to work intrude on an issue reserved to the Commissioner is accurate.  20 C.F.R. § 416.927(e).  However, it is too narrow a reading of Nurse Practitioner Brager's opinion.  The questions posed to Nurse Practitioner Brager asked for the frequency with which Deal would be absent and off-task.  (Tr. 2361).  Nurse Practitioner Brager's answers, at the least, implied one absence per week, which, according to the ALJ, would be work preclusive.  And the ALJ's finding that Nurse Practitioner Brager did not explain the basis for the absenteeism limitation is not entirely accurate.  Nurse Practitioner Brager cited Deal's anxiety, which is related to Deal's racing thoughts.  (Tr. 2360–61).  Racing thoughts were among the symptoms Deal specifically attributed her inability to timely report to work on a regular and continuing basis.  (Tr. 43, 46); *see also* (Tr. 1558).  And anxiety was among the remarkable exam findings present in Nurse Practitioner Brager's treatment notes during periods of sobriety.  *See* (Tr. 2076, 2078, 2081–82, 2086, 2088, 2092, 2098–100, 2102, 2104).

Thus, a remand is also necessary for the ALJ to revisit his evaluation of Nurse Practitioner Brager's opinion as it pertains to the ALJ's materiality analysis.

## IV.    Conclusion

Because the ALJ failed to apply proper legal standards in his evaluation of the materiality of Deal's alcoholism to her disability and in the evaluation of certain opinion evidence, the Commissioner's final decision denying Deal's application for SSI is vacated and that Deal's case is remanded for further consideration.

**IT IS SO ORDERED.**

Dated: April 11, 2023

Thomas M. Parker
United States Magistrate Judge